NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

| | | |
|---|---|---|
| EQUAL EMPLOYMENT | : | |
| OPPORTUNITY COMMISSION, | : | |
| | : | |
| Plaintiff, | : | Civil No. 10-3095 (JAP)(DEA) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| FAPS, INC., | : | |
| | : | |
| Defendant. | : | |

_____:

PISANO, District Judge.

Plaintiff, the Equal Employment Opportunity Commission ("EEOC"), filed this action against Defendant Foreign Auto Preparation Service, Inc. ("FAPS") after a member of the EEOC filed a charge alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.* Generally, the complaint alleges that FAPS engaged in a company-wide pattern or practice of discrimination against African Americans in recruiting and hiring.

Before the Court are several motions brought by FAPS and the EEOC. FAPS has filed a motion for summary judgment on the EEOC's Title VII claims [ECF No. 107]. FAPS has also filed a motion to exclude the testimony of the EEOC's expert witnesses [ECF No. 123]. Likewise, the EEOC has filed a motion to exclude the testimony of FAPS's expert witness [ECF No. 113]. These motions are based almost exclusively on the grounds that the testimony of these experts fails to meet the standards delineated by the United States Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). For the reasons set forth below, the Court grants FAPS's summary judgment motion in part, and denies it in part. The Court denies FAPS's motions to

exclude the testimony of the EEOC's expert witnesses, and grants the EEOC's motion to exclude the testimony of FAPS's expert witness.

## I.    Background

FAPS is a New Jersey corporation with principal offices in Port Newark, New Jersey.  FAPS operates a large auto processing facility, which processes automobiles moving through Port Newark.  FAPS is owned and operated by two brothers, Gary and August LoBue, the grandsons of founder August LoBue.  FAPS provides a wide range of services, from the short-term storage of vehicles to be transported to dealerships to the customization of luxury cars.

On October 18, 2007, Stuart Ishimaru, a member of the EEOC, filed a Commissioner's Charge, alleging violations of Title VII by FAPS.  After an investigation, the Commission found reasonable cause to believe that FAPS engaged in a company-wide pattern or practice of discrimination against African Americans in recruiting and hiring from at least 2004 until the present.  Arising out of this investigation, the Commission also found reasonable cause to believe that FAPS made improper pre-employment disability-related inquires in its application forms, in violation of the ADA.

The facts of this case are strongly disputed by both sides.  The EEOC alleges that, from 2003–2008, FAPS hired hundreds of workers, the majority of whom are unskilled or semi-skilled workers.  FAPS, however, disputes that it was hiring or looking to hire unskilled or semi-skilled workers; rather, it argues that from 2003 to 2013, when it did hire, it focused on hiring and recruiting employees for skilled job positions.  The parties also dispute the various qualifications that FAPS required in its potential employees, and whether or not FAPS will train and/or cross-train its employees for other jobs at FAPS.  FAPS also disputes that it was hiring hundreds of workers during the relevant time period; rather, FAPS emphasizes that the automobile industry was going

through turmoil at this time, and it was forced to lay off 200 employees.  In certain years, FAPS contends that it did not make any recruiting efforts; for example, in 2007 and 2008 it asserts it only hired individuals that were mandatory hires from Nissan in order to obtain an account from Nissan, or Mazda employees as a condition of an acquisition deal of certain Mazda work.  Other than these hires, FAPS asserts that it did not recruit or hire in 2008.  The EEOC disputes this contention, and has supplied evidence of certain job postings by FAPS from these years.

The EEOC has alleged that FAPS relied primarily on word of mouth to recruit its workers from 2003 through 2008.  It is undisputed that FAPS did not have an official policy promoting or encouraging word-of-mouth recruiting.  FAPS management was aware that FAPS workers would spread the word in its "small community" when there were job openings at FAPS.  While FAPS did not generally advertise externally, it would often post a hiring announcement near the employee time clock.  Seemingly as a result, FAPS would receive a large number of "walk-in" applicants, at times almost every day, for these positions.  After 2010, FAPS broadened its recruitment process, and starting using online services such as Craigslist, technical schools, and the Newark OneStop Program.

Julie Lynch, the current Human Resources Manager, has admitted that FAPS did not undertake any efforts to recruit African Americans in 2007, 2008, or 2009.  Where the race of FAPS workers can be determined, between 2003 and 2008 FAPS only hired twelve African American unskilled or semi-skilled workers, whereas it hired 263 non-African Americans.  Over 10 years, FAPS hired only 16 African Americans out of 339 new hires in what the EEOC has alleged are unskilled or semi-skilled positions.  As discussed more fully below, the EEOC's expert labor economist, Dr. Robert LaJeunesse, has concluded that there is essentially a zero percent probability that such a low hiring rate for African Americans would occur by chance.

FAPS has, at least in part, described any alleged failure to hire or recruit African Americans on both its lack of hiring during the relevant years, the mandatory hiring of employees from Nissan and Mazda, and the skill level of the employees for which it was searching. FAPS also argues that the Waterfront Commission of New York Harbor ("Waterfront Commission") and the International Longshoremen's Association, Local 1478 (the "Union") are "inextricably woven in the selection and hiring process at FAPS," which impacts the discretion that FAPS has in hiring applicants for job openings. *See* Def.'s Br. at 4–6. First, under the rules of the Waterfront Commission, any applicant for a job in which he or she will come into contact with waterborne freight must obtain a waterfront card from the Waterfront Commission. An applicant cannot apply to the Waterfront Commission for a waterfront card without a "sponsorship letter" from an employer. Accordingly, people seeking to work at FAPS would go to its office, fill out an application, and then be interviewed by Lynch. The FAPS job application seeks basic information about work experience and training. It also asks questions about how the applicant was referred to FAPS and whether the applicant has a criminal background. Lynch reviews the application on the spot, conducts a basic interview, which usually covers work experience or background, and then discusses work hours and pay. Lynch would then present the application to William Mazur. Mazur is the Vice-President and General Manager of FAPS, and has worked at FAPS for 30 years. Mazur signs off on whether the applicant is given a sponsorship letter for the Waterfront Commission. The denial of a sponsorship letter by FAPS is effectively a denial of employment. In other words, while a sponsorship letter is not a promise of employment, when FAPS gives someone a sponsorship letter it usually means that FAPS has a job for that person and that the applicant will be hired. If FAPS provides a sponsorship letter, the applicant then seeks a waterfront card from the Waterfront Commission.

Generally, the process of applying for a waterfront card involves filing out an application, paying a fee, and providing documentation. Upon receiving an application, the Waterfront Commission conducts a background check and determines whether the applicant meets certain standards. The Waterfront Commission has complete discretion to determine to disqualify a registration applicant because of a prior bad act or conviction. The Waterfront Commission will also consider a list of factors relevant to the holistic consideration of an application, including prior criminal behavior, history of workplace violence, theft, fraud, and other "bad acts" such that he should not be permitted to work at the Port. According to Jeffrey Schoen, the Director of Law and Licensing for the Waterfront Commission, it is not the conviction or the arrest per se that is the grounds for denying an application, but rather the facts and circumstances of the underlying act that is significant to the Waterfront Commission when making a determination. There appears to be a dispute between the parties with regards to how long the Waterfront Commission would take to review an application. FAPS has asserted that it was experiencing long delays in hiring because of this application process, because the process was taking up to 8 to 12 weeks. The EEOC disputes the significance of this, as these delays allegedly did not start until 2010. Once the waterfront card is issued, the applicant returns to FAPS and can start working. FAPS cannot hire anyone before a waterfront card is issued by the Waterfront Commission.

FAPS has also asserted that the Union is a significant presence in the employment practices at FAPS. Under the collective bargaining agreement ("CBA"), FAPS is required to notify the Union of any employment opportunities, and interview all potential employees referred to FAPS by the Union. FAPS has asserted that the CBA governs the terms and conditions of employment at FAPS, including the method of selection and other conditions of recruitment and hiring. However, FAPS witnesses have admitted that the CBA places no limitations or restrictions on FAPS's ability

to recruit and hire applicants of its choosing, other than to interview any Union referrals. Furthermore, FAPS's witnesses and Union officials have testified that FAPS is under no obligation whatsoever under the terms of the CBA to hire any of Union members.  FAPS, however, argues that the Union has effectively told FAPS how and when to hire employees, or else it may face "slowdowns" by the Union.  It is disputed whether or not any issues of animosity or other like problems arise when FAPS does not hire a Union referrals.

After a failed attempt at conciliation, the EEOC filed a Complaint against FAPS on June 17, 2010.  The Complaint alleges, *inter alia*, that since at least 2004, FAPS has engaged in a pattern or practice of failing or refusing to hire African Americans, in violation of Title VII.  FAPS filed this current motion for summary judgment, arguing that the EEOC has failed to establish that FAPS uses "word-of-mouth" recruiting for what it describes as its semi-skilled and skilled workforce.  It also argues that the external barriers of the Waterfront Commission and the Union on its recruitment and hiring preclude any liability for FAPS.  The EEOC argues that it has provided evidence of FAPS's alleged systematic efforts to exclude African Americans through its recruitment, application and hiring process, creating a pattern or practice of intentional race discrimination.  It also argues that it has supplied sufficient evidence to establish that FAPS used word-of-mouth recruiting to maintain an all-White workforce, creating a disparate impact violation of the law. FAPS also moves for summary judgment on the EEOC's alleged failure to engage in conciliation in good faith.   Finally, FAPS argues that certain applicant claims are time barred.  The Court addresses these arguments below.

## II.    Motion to Exclude Expert Testimony

Before moving to the summary judgment motion, the Court will first address the preliminary issue of whether any of the three proffered expert's opinions should be excluded.

In order to prove its case, the EEOC has attempted to offer two witnesses, Dr. Robert LaJeunesse and Dr. Palmer Morrel-Samuels, as experts pursuant to Federal Rule of Evidence 702. FAPS has attempted to offer one witness, Donald Conway, as an expert pursuant to Rule 702. Both EEOC and FAPS has moved to exclude the other side's experts.

A. *Daubert Standard*

Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Rule 702 provides that where

> scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The party offering the expert testimony has the burden of proving admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592; *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743–44 (3d Cir. 1994). Courts act as a gatekeeper, performing a "screening function" to ensure the required relevance and reliability of the opinion testimony. *See Daubert*, 509 U.S. at 592 ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) [of the Federal Rules of Evidence] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."); *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999).

The Third Circuit has explained that Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit." *Schneider v. Fried*, 320 F.3d 396, 405 (3d Cir. 2003) (citing *In re Paoli*, 35 F.3d 717, 741-43 (3d Cir. 1994)). In order for a witness to be deemed

qualified to testify as an expert, the witness must possess specialized knowledge, training, or skill. This requirement has been interpreted liberally. *See Schneider*, 320 F.3d at 404 (explaining that the Third Circuit have allowed a "broad range of knowledge, skills, and training" to qualify an expert) (quoting *Paoli II*, 35 F.3d at 740–41). For testimony to be considered sufficiently reliable, "it 'must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his on her belief." *Id.* (quoting *Paoli II*, 35 F.3d at 742 (quoting *Daubert*, 509 U.S. at 590)). Finally, the expert's testimony must "fit" or "be relevant for the purposes of the case and must assist the trier of fact." *Calhoun v. Yamaha Motor Corp., U.S. A.*, 350 F.3d 316, 321 (3d Cir. 2003) (quoting *Schneider*, 320 F.3d at 405); *see also Paoli II*, 35 F.3d at 743 ("[A]dmissibility depends in part on the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.") (quotation omitted). While the standard for "fit" is higher than basic relevance, it is not that high. *See Paoli II*, 34 F.3d at 735. Overall, Rule 702 embodies a liberal policy of admissibility. *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008).

      B.    *The Experts*

          1.    <u>Dr. Robert LaJeunesse</u>

Dr. Robert LaJeunesse is offered by the EEOC as an expert in the field of labor economics. He has analyzed a variety of information and data provided by FAPS and external sources to assess the racial neutrality of FAPS's hiring decisions relative to labor market benchmarks. Dr. LaJeunesse conducted a statistical study of FAPS's hiring patterns from 1999 through 2013, and concluded that, from 1999 to 2008, FAPS hired fewer African Americans than would be expected, given the available labor market. Dr. LaJeunesse found that the z-score for this period, -9.16,

indicates that the aggregate shortfall is statistically significant, and that there is effectively zero probability that this outcome could have occurred by chance.

FAPS does not challenge the qualifications of Dr. LaJeunesse; rather, it argues that his testimony and conclusions are unreliable.  Dr. LaJeunesse compared the actual numbers of hires of African Americans by FAPS to the number expected from a local labor market to assess the neutrality of FAPS's hiring.  In some instances, an employer's hiring can be compared to the proportion of workers in the flow of applications for vacant positions if the applications pool can be considered reliable.  Dr. LaJeunesse, however, did not find that FAPS's applicant flow data was reliable for several reasons.  First, he found that FAPS only provided applications for less than half of known hires, and only provided applications for a little more than half of a known group of applicants referred to the Waterfront Commission.  Next, he found that the African American representation rate of the extant FAPS applications is significantly lower than the labor force participation rate of African Americans in the local labor market.  According to Dr. LaJeunesse, the African American representation rate of the application pool at FAPS is 11.4%, while the Census data for the overall labor force in Essex and Union counties in New Jersey estimates a representation rate for African Americans of 31%.  The African American representation rate for the occupations at issue in this litigation is 29.9% in the 2000 Census, and 19.9% in the 2006–2010 Census.  Dr. LaJeunesse combined three race-related data sources,[1] eliminating any double counting, and ascertained the race of 442 applications.  Fifty-two of these applicants identified as African American, leading to the African American representation rate of 11.4%.  The absence of

---

[1] Because the applications of FAPS does not reflect the race of an applicant, Dr. LaJeunesse had to use other sources to ascertain the race of the applicants.  The Waterfront Commission list contained information about the race of the applicants, but only 211 individuals on this list appeared in FAPS's application database.  From FAPS's HR data or other self-reported race sheets that were completed by FAPS employees, Dr. LaJeunesse could ascertain the race of 192 hires.  Finally, from Dr. Morrel-Samuels's survey, Dr. LaJeunesse was given the race of 155 applicants.  Combined, there were 442 applicants, out of 1,123, of whom Dr. LaJeunesse could ascertain the race.

African American applicants to FAPS relative to the local workforce not only indicated to Dr. LaJeunesse that the collection of applications he was given was unreliable, but also that the positions were not sufficiently advertised to the diverse labor force in the vicinity of FAPS.

Dr. LaJeunesse also found that application database was not reliable as an indicator of the true availability of African Americans to work at FAPS in the relevant positions because of certain non-race data contained in the applications.  For example, the ability to speak Portuguese is greater among the applicants than the general population in Essex and Union counties, and higher among the applicant-hires than the applicant non-hires.  Further, Dr. LaJeunesse found that more than one-third of the applicants answered that they had a friend or relative employed at FAPS, and more than 76% listed that they heard about a vacant position at FAPS from a friend.  Only 4% reported that they heard about a vacant position from newspaper advertisements, and 20% reported other means. Dr. LaJeunesse concluded that this data suggested that applicants were made aware of job vacancies via insider knowledge.

Because Dr. LaJeunesse found that the application database was not reliable, he had to use a different proxy for the workforce that would have applied under "conditions of normal labor supply" at FAPS.  *See* Expert Report of Dr. Robert LaJeunesse Report ("LaJeunesse Report") at 5. He used the US Census Bureau's Special EEO Data Tabulation, and used both the 2000 and the newer 2006–2010, for Essex and Union Counties.  Dr. LaJeunesse chose these counties because nearly two-thirds of the employees on FAPS's payroll in 2007–2013 list a zip code that is located within these counties, and he also analyzed commuting patterns in the data to choose the counties. In choosing the relevant job categories in the Census data, Dr. LaJeunesse relied on job applications and FAPS's own computerized data where FAPS entered the position into which it hired an individual.  He also relied on the testimony of FAPS officials, which led Dr. LaJeunesse to the

10

conclusion that FAP hired predominately "low skilled individuals minimally educated," Deposition of Dr. Robert LaJeunesse ("LaJeunesse Dep.") 42:2–3, for "unskilled, entry-level positions." LaJeunesse Report at 6.  Using the FAPS data, he chose a mix of job categories to identify an appropriate benchmark in the Census data, and he chose the most relevant job categories from the descriptive choices.  Accordingly, based on the "position" data in the HR hires and the coded applications database and the department data listed in the ADP database, Dr. LaJeunesse weighted the Census benchmark as follows to represent the work performed at FAPS:  45% laborers and freight, stock and material movers; 35% miscellaneous assemblers and fabricators; and 20% miscellaneous motor vehicle operators.

Dr. LaJeunesse then compared FAPS's hiring patterns to the Census benchmark for Essex and Union counties and concluded that FAPS hired fewer African American employees than would be expected based on their availability in the local labor market.  These shortfalls were statistically significant every year in which more than 10 employees were hired.  Dr. LaJeunesse further observed that FAPS's hiring patterns changed after FAPS had notice of the EEOC's Complaint in this matter.  While in the period of 1998–2008 FAPS hired 74 fewer African Americans than expected from the Census benchmark during the entire period, FAPS's record improved after 2009 and it hired more African Americans than expected in 2011 and 2012.

Having reviewed the arguments contained within FAPS's motion and the briefs therein, the Court finds that Dr. LaJeunesse's reports and testimony are admissible.  The testimony of Dr. LaJeunesse rests on sound methodology and will assist the trier of fact.  *See Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc.*, 546 F. Supp. 2d 155, 168 (D.N.J. 2008) (citing *In re Paoli*, 35 F.3d at 742).  FAPS argues that Dr. LaJeunesse's testimony is unreliable because it is based on unreliable facts and data.  FAPS's arguments, however, concern its assertion that Dr. LaJeunesse's

11

testimony has failed to establish that FAPS is liable for the employment discrimination claims brought against it.  The evidentiary requirements for admissibility of an expert, however, are lower than the requirements for proving liability.  *See In re Paoli*, 35 F.3d at 744.  At this stage, the proponent of an expert's testimony need not even prove that the assessments of its expert are correct; rather, they need only demonstrate that the expert's opinions are reliable.  *See id.* (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)).  As the Third Circuit has made clear, "an expert's opinion is reliable if it is based upon the methods and procedures of science rather than on subjective belief or unsupported speculation."  *Floorgraphics*, 546 F. Supp. at 168 (quoting *In re Paoli*, 35 F.3d at 742).  Here, Dr. LaJeunesse's opinion is clearly based on reliable methodology.

FAPS has also offered a list of facts that Dr. LaJeunesse supposedly did not consider in making his analysis.  These arguments that FAPS has advanced relate to questions of credibility or weight, not to the issue of admissibility.  *See Walker v. Gordon*, 46 F. App'x 691, 695–96 (3d Cir. 2002) ("An expert is, nonetheless, permitted to base his opinion on a particular version of disputed facts and the weight to be accorded to that opinion is for the jury.") (citing *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002)).  The court's gate-keeping function extends to evaluating whether the methodology used by the expert is reliable, not to weigh the evidence relied upon by the expert or determine if it agrees with the conclusions reached therein.  *See Breidor v. Sears, Roebuck and Co.*, 722 F.2d 1134, 1138–39 (3d Cir. 1983) ("Where there is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is to be determined by the jury, not the trial judge.").  FAPS's disagreement with the conclusions that Dr. LaJeunesse has drawn, and the inferences he has made to reach these conclusions, are not grounds for excluding his opinion.  Rather, FAPS may appropriately challenge these conclusions and inferences during cross-examination.  *See Stecyk*, 295 F.3d at 414 ("Rule 705, together with Rule 703, places the burden of

exploring the facts and assumptions underlying the testimony of an expert witness on opposing

counsel during cross-examination."); *see also Potoski v. Wilkes Univ.*, 3:06-CV-2057, 2010 WL

3811973, at \*5–6 (M.D. Pa. Sept. 22, 2010). Here, the Court has reviewed Dr. LaJeunesse's reports

and testimony and finds that they are supported by sufficiently reliable evidence.   Accordingly,

FAPS's motion to exclude the testimony of Dr. LaJeunesse is denied.

> 2.   Dr. Palmer Morrel-Samuels

Dr. Palmer Morrel-Samuels is a research psychologist and an expert in surveys.  He was

retained by the EEOC to ascertain the race of as many applicants as possible, using scientifically-

valid data collection techniques, because the application forms produced by FAPS did not reflect

the race of the applicants.  Dr. Morrel-Samuels was asked to collect information on the race of all

FAPS job applicants between January 1, 2004 and November 7, 2011, which required him to

construct and administer a survey to collect the missing race data of applicants from the applicants

himself.  Dr. Morrel-Samuels was provided a dataset of 926 names of FAPS applicants by the

EEOC.  Dr. Morrel-Samuels sorted the dataset and determined that 851 individuals corresponded

with one social security number, which he used to obtain the most current addresses and telephone

numbers for those 851 applicants.

Dr. Morrel-Samuels and his research assistances administered their survey by following the

model developed by the U.S. Census Bureau.  Dr. Morrel-Samuels simplified the U.S. Census

Bureau questions by aggregating several less common racial categories (such as Samoans) to

minimize the burden on respondents.  Dr. Morrel-Samuels and his research assistants first

administered the survey by mail, then re-administered it by telephone. The survey that was mailed

to all 851 applicants included an introductory letter that, *inter alia*, explained the purpose of the

survey, how to respond, and listed the two survey questions themselves. The survey package also

included a preaddressed return envelope and a $10 check as a nominal thank-you to participants. Five days after mailing the initial invitation letter, Dr. Morrel-Samuels sent a brief reminder to the 851 applicants.  In designing the survey, Dr. Morrel-Samuels drew on published research on survey methodology and followed best practices for enhancing response rates while maximizing data quality.  If the research team received a mailed survey package that was returned unopened by the United States Post Office as undeliverable, they followed the guidelines recommended by the American Association for Public Opinion Research (AAPOR) and dropped the individual from the list of eligible responders.

Dr. Morrel-Samuels's research assistant also attempted to administer the survey by telephone.  To conduct the telephone survey, the interviewers used a computer to guide and standardize the interview process but used a flexible interview protocol to avoid sounding overly mechanical.  The methodology used is a standard methodology called CATI (Computer Assisted Telephone Interviews).  Because English comprehension was a prerequisite for completing the telephone interview, individuals who did not speak English were dropped from the list of eligible respondents.  Individuals who had a disconnected or wrong telephone number were also dropped from the list of eligible respondents.  This is consistent with the AAPOR's guidelines on computing response rates.  Consistent with the literature on research methodology as a means for evaluating the extent of agreement in data from the mailed surveys and telephone surveys, the research team re-administered the telephone survey in a limited, randomly-selected, number of cases.

Dr. Morrel-Samuels concluded that the agreement between the mail and telephone surveys was nearly identical.  Dr. Morrel-Samuels also evaluated the data from the two research assistants who conducted the telephone survey, and concluded that the two research assistants gathered the data in a nearly identical manner.  The construct validity of the method was tested by comparing

14

survey results and the independently gathered race identification in FAPS's hiring database, thus comparing the efficacy of the two methods, finding a p-value of less than .00001. There is an exceptionally rare chance that such a degree of agreement could occur by chance, and validates the survey.

After excluding the necessary applicants, Dr. Morrel-Samuels had 491 eligible respondents. He received 155 mailed or telephonic responses to the survey, and calculated the response rate to be 32%, which is a rate entirely consistent with current research on response rates in the United States. This rate is actually higher than the average rate of 20% for this type of survey. Dr. Morrel-Samuels concluded that 22 FAPS applicants out of the 155 survey respondents (or 14.2% of respondents) identified their race as African American. This information was provided to Dr. LaJeunesse, who incorporated it into his applicant database.

Like with Dr. LaJeunesse, FAPS does not argue about the qualifications of Dr. Morrel-Samuels but rather disputes the reliability of his testimony and report.[2] First, FAPS argues that Dr. Morrel-Samuels misrepresented the response rate of the survey respondents as 32% when it is really 18%. FAPS has simply reported the wrong math in the calculation: 155 people actually responded to Dr. Morrel-Samuels's survey out of 491 potential respondents, or 18%. FAPS also argues that Dr. Morrel-Samuels did not actually know if all 14% were African Americans, because the survey asked the respondents to self-identify their race. "Self-identification" of race is an approved method, endorsed by the U.S. Census and social science literature. *See, e.g.*, United Stated Census Bureau, *About Race* (July 8, 2013), https://www.census.gov/topics/population/race/about.html.

---

[2] FAPS has also argued that Dr. Morrel-Samuels's testimony and report should be excluded because the EEOC failed to identify Dr. Morrel-Samuels as required by Federal Rule of Civil Procedure 26. Under Rule 26(a)(2)(D), expert disclosures must be made "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). FAPS implies that it was not aware that a report from an expert like Dr. Morrel-Samuels would be presented, but the EEOC has supplied evidence indicating that FAPS was aware that the EEOC would be designating a psychologist to assist in surveying applicants on or about March 13, 2013. Further, the EEOC sent Dr. Morrel-Samuels's report on August 15, 2013, the same day it served Dr. LaJeunesse's report. The deadline for expert disclosures in this case was August 15, 2013. Accordingly, FAPS's motion to exclude Dr. Morrel-Samuels's report and testimony under Rule 26 is denied.

The Court finds that FAPS's other arguments regarding the reliability of Dr. Morrel-Samuels lack merit.  FAPS asserts that the surveys were not performed correctly; however, Dr. Morrel-Samuels used the same survey methodology that the U.S. Census Bureau uses, which is widely respected for its methodological rigor and straightforward comprehensibility.  Dr. Morrel-Samuels followed the techniques recommended by the AAPOR in excluding certain people from his list of eligible respondents.  Dr. Morrel-Samuels also created a proper survey universe, consisting of 851 individuals who applied for a job at FAPS and for whom he was trying to discern race so Dr. LaJeunesse could conduct his statistical analysis.  *See Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 118–19 (3d Cir. 2004) (explaining that a survey of the "wrong universe" has little probative value).  Surveys that are conducted in accordance to accepted principles and sufficiently reliable should be admitted; concerns about "'mere technical flaws' in methodology go to 'the weight accorded a survey, not its admissibility.'" *Fancaster, Inc. v. Comcast Corp.*, 832 F. Supp. 2d 380, 402 (D.N.J. 2011) (quoting *Citizens Financial*, 383 F.3d at 121.  Overall, FAPS's criticisms largely appear to address whether or not Dr. Morrel-Samuels's survey discerned the number of alleged discriminatory acts by FAPS.  *See* Def.'s Br. at 34.  Dr. Morrel-Samuels never attempts to draw conclusions in regards to whether the African Americans who answered his survey were discriminated against; his survey was simply to provide more information about the race of applicants for FAPS employment.  On the very limited conclusion that Dr. Morrel-Samuels does actually reach, his method is reliable.  Accordingly, FAPS's motion to exclude Dr. Morrel-Samuels's report and testimony is denied.

3.    <u>Mr. Donald Conway</u>

Mr. Donald Conway has been proposed by FAPS to rebut the report of Dr. LaJeunesse.  Mr. Conway is a certified public account ("CPA") whose area of expertise is in bankruptcy litigation

and valuation, and as an operating bankruptcy trustee. He has over 40 years of professional experience in accounting, finance, and union relations, and has provided accounting and financial services for numerous corporations, not-for-profit organizations and quasi-governmental entities through New York and New Jersey. He also served as a financial executive with the New York Mets Baseball Club, as the executive director of the United States Tennis Association ("USTA"), and has been a chief operating officer at various companies. He was retained by FAPS to analyze their business, financial, and human resources records relating to their recruitment and hiring practices, and the actual impact on these practices resulting from the contractual and/or regulatory requirements imposed by the Union and the Waterfront Commission.

The EEOC argues that Mr. Conway's opinions and testimony is unreliable and speculative, and should not be admitted. It is well-established that expert testimony that is based upon unsupported speculation is unreliable and inadmissible. *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000) ("An expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation.") (quoting *Paoli II*, 35 F.3d at 742) (internal quotation omitted). Statistical proof that creates an inference of discrimination may not be rebutted by "mere conjecture or assertion that some missing factor would explain the existing disparities." *Contractors Ass'n of E. Pennsylvania, Inc. v. City of Philadelphia*, 6 F.3d 990, 1006–07 (3d Cir. 1993) (quoting *Palmer v. Shultz*, 815 F.2d 84, 101 (D.C. Cir. 1987) (internal quotation omitted); *see also Bazemore v. Friday*, 478 U.S. 385, 403 n.14 (1986) (noting that the defendants "declared simply that many factors go into making up an individual employee's salary" but made no attempt—"statistical or otherwise—to demonstrate that when these factors were properly organized and accounted for there was no significant disparity between the salaries of blacks and whites"). In other words, "[w]hen challenging the admissibility of Plaintiff's expert testimony, a party must

move beyond empty criticisms and demonstrate that a proposed alternative approach would yield different results." *Floorgraphics*, 546 F. Supp. 2d at 172 (relying on *Bazemore*).

Here, in his report and testimony, Mr. Conway purports to discuss the nature of FAPS's business and obligations to the Union and the Waterfront Commission and the real-world impact it has had on FAPS's hiring policies. In doing so, Mr. Conway lists out various factors that he asserts demonstrate that Dr. LaJeunesse misconstructs the Census data and/or miscalculates the appropriate groups to use in constructing his benchmark. Mr. Conway alleges that these "business necessity" factors change or distort the analysis done by Dr. LaJeunesse so as to make his calculations unreliable. For example, Mr. Conway opines that the Waterfront Commission application process results in discouraging "potential candidates applying to obtain a Waterfront Card" because of costs, the length of the wait, and processing delays, including delays take place when applicants have "less than clean [criminal] records." Report of Mr. Donald Conway ("Conway Report") at 8. Mr. Conway opines that Dr. LaJeunesse "should have considered the number of applicants who would drop out because of the intimidating process of the Waterfront Commission." *See* Deposition of Mr. Donald Conway ("Conway Dep.") T152:21–T153:2. While Mr. Conway's report does not express an opinion on whether these factors would affect the relevant applicant pool on the basis of race, he explained at his deposition that "there's perhaps a strong possibility that the number of African Americans who would apply for that position would have had some incident with law enforcement, whoever it be, drugs, or whatever" and that he "just think[s] that there's a higher propensity for that possibility among African Americans." Conway Dep. T152. It was Mr. Conway's opinion that anyone with a criminal record had a high probability of being disqualified and would therefore be discouraged and remove themselves from the application process. *Id.* at T151–52.

Mr. Conway also opines that Dr. LaJeunesse committed an error by ignoring that the CBA between FAPS and the Union effectively limits FAPS's ability to freely choose its own workforce and, consequently, the racial composition of its workforce. Mr. Conway explains that the requirement to interview Union members "limits the racial makeup of the group [of potential candidates], because basically you have the union as your base of hiring people, and it's a well-known fact that in the unions for the longshoremen, there are a limited number of African Americans." Conway Dep. T190:16–25. Based on his experience with unions, Mr. Conway believes that Dr. LaJeunesse erred in not considering that, even though the CBA did not mandate the hiring of Union members, FAPS had to hire Union members because a failure to do so would run the risk of slowdowns or strikes. *See id.* at T191, 199–200. Therefore, Mr. Conway concludes that there are errors in Dr. LaJeunesse's benchmark because FAPS "must draw some of its workforce" from the Union, which has a predetermined racial composition that it has no control over. *See* Conway Report at 6–7, 20. Mr. Conway also argues that Dr. LaJeunesse failed to provide "more weight to potential employees with access to private automobile transportation" because FAPS is located in Port Newark, an area that has limited public transportation. Mr. Conway opined that there is data that shows an alleged significant percentage of those without access to automobiles are African Americans, and states that Dr. LaJeunesse should have "factored it in somehow," but that he didn't know what type of methodology to use to factor this in. *See* Conway Dep. T132.

The conclusions that Mr. Conway makes in his report and testimony are clearly speculative and fail to reach the standard established in *Bazemore* as construed by the Third Circuit. For example, Mr. Conway speculates that the Waterfront Commission process discourages potential applicants from applying, and that this process disproportionately affects the labor pool of African Americans. He bases this, however, on no scientific evidence, no surveys, or no data of any type.

19

He is not a psychologist, and has no training that would indicate that he is otherwise qualified to speak to motivational factors of potential applicants.  Indeed, Mr. Conway never conducted any tests or otherwise demonstrated that *any* of the factors that he listed as potentially affecting Dr. LaJeunesse's benchmark would actually have an effect on the labor benchmark.  *See Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 322 (3d Cir. 2003) (finding an expert's testimony to be "speculative and unreliable" when "[t]here was no literature confirming this theory, nor demonstrable tests"); *Oddi*, 234 F.3d at 158 (finding an proposed expert's testimony to be unreliable when he "conducted no tests" and appeared to use "little, if any, methodology beyond his own intuition").  Mr. Conway himself has stated that his purpose as a purported expert was "to point out factors that, in my opinion, should have been considered and were not considered."  Conway Dep. T119–20.  Mr. Conway's testimony cannot, however, be admitted to rebut Dr. LaJeunesse's statistical proof when it is simply "mere conjecture or assertion that some missing factor would explain the existing disparities."  *Contractors Ass'n of E. Pennsylvania*, 6 F.3d at 1006–07.  While the *Daubert* standard does not require a "paradigm" of scientific inquiry or detailed scientific study, "it does more than the haphazard, intuitive inquiry that [Mr. Conway] engaged in."  *Oddi*, 234 F.3d at 156.  Consequently, because Mr. Conway's report is based on the type of "subjective belief or unsupported speculation" that is barred under *Daubert*, *see Paoli II*, 35 F.3d at 742, the Court must grant the EEOC's motion to exclude the expert opinion of Mr. Conway.

### III.   Legal Standard

#### A.   *Summary Judgment Standard*

Federal Rule of Civil Procedure 56(a) provides that "a court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The substantive law identifies

which facts are material.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact raises a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict" for the non-moving party.  *Healy v. N.Y. Life Ins. Co.*, 860 F.2d 1209, 1219 n.3 (3d Cir. 1988).

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party.  *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).  The Court shall not "weigh the evidence and determine the truth of the matter," but need determine only whether a genuine issue necessitates a trial.  *Anderson*, 477 U.S. at 249.  While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 250.  If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be no genuine issue of material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quotation omitted).  If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment.  *Big Apple BMW v. BMW of N. Am.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

   B.     *Proving Title VII Claims*

Title VII of the Civil Rights Act of 1964, Section 703(a), 42 U.S.C. § 2000e *et seq.*, prohibits various forms of employment discrimination on the basis of race, color, religion, sex, or

national origin.  This general proscription against discrimination in employment practices is set

forth in 42 U.S.C. § 2000e–2(a), which provides:

> (a) It shall be an unlawful employment practice for an employer—
>     (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>     (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex or national origin.

42 U.S.C. § 2000e–2(a).  "Title VII prohibits both intentional discrimination (known as 'disparate

treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have

a disproportionately adverse effect on minorities (known as 'disparate impact')." *Ricci v.

DeStefano*, 557 U.S. 557, 577 (2009).

      1.     <u>Pattern or Practice of Disparate Treatment</u>

A pattern or practice action is a particular way to bring a discrimination claim under Title

VII.  To substantiate a claim of pattern or practice of violating Title VII, a party must provide

"more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *Int'l

Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977).  Rather, a party must "establish by a

preponderance of the evidence that racial discrimination was the company's standard operating

procedure the regular rather than the unusual practice." *Id.*  In other words, a company engages in a

pattern or practice of discrimination when it "regularly and purposefully" engages in less favorable

treatment of some group in some aspect of its employment practices. *Teamsters*, 431 U.S. at 335;

*see also Sperling v. Hoffmann-La Roche, Inc.*, 924 F. Supp. 1346, 1357 (D.N.J. 1996).  As stated in

*Teamsters*, the discrimination must be proven to be the company's "standard" policy in light of all

the circumstances of the case.  *See Teamsters*, 431 U.S. at 336.  In this way, there is a "crucial

difference" between a pattern or practice of discrimination and an individual claim because "the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking." *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984) (quotation and citation omitted). Accordingly, "courts considering what evidence is necessary to show that an employer routinely and purposely discriminated have also required substantial proof of the practice." *King v. Gen. Elec. Co.*, 960 F.2d 617, 624 (7th Cir.1992).

Generally, a pattern or practice suit is divided into two phases: liability and remedial. *See id.* at 360–62; *see also Dillon v. Coles*, 746 F.2d 998, 1004 (3d Cir. 1984). At this initial "liability" stage, plaintiffs must produce sufficient evidence "that discrimination was the employer's standard practice." *Dillon*, 746 F.2d at 1004; *see also Teamsters*, 431 U.S. at 360. Once a plaintiff establishes a prima facie case that the employer intentionally discriminated against the protected group, the burden shifts to the employer to show that the EEOC's "proof is either inaccurate or insignificant." *Teamsters*, 431 U.S. at 360. Defendants may "assault . . . the source, accuracy, or probative force" of plaintiff's proof. *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 159 (2d Cir. 2001) (quoting 1 Arthur Larson et al., Employment Discrimination § 9.03[2], at 9–23 to 9–24). "Any nondiscriminatory justification offered by the company will be subject to further evidence by the Government that the purported reason for an applicant's rejection was in fact a pretext for unlawful discrimination." *Teamsters*, 431 U.S. at 362 n. 50. If the plaintiffs are successful with proving liability, they are "entitled to an injunction barring continuation of the discriminatory practice." *Dillon*, 746 F.2d at 1004. "When the Government seeks individual relief for the victims of the discriminatory practice, a district court must usually conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief." *Teamsters*, 431 U.S. at 361. This case is currently at the liability phase.

In order to establish liability under a disparate treatment theory, "proof of the employer's discriminatory motive is critical." *E.E.O.C. v. Metal Serv. Co.*, 892 F.2d 341, 347 (3d Cir. 1990). A party may show discriminatory intent "by direct evidence or through indirect or circumstantial evidence." *Id.* at 347 (internal citations omitted); *see also Teamsters*, 431 U.S. at 335 n. 15 ("Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment."); *Green v. USX Corp.*, 843 F.2d 1511, 1526 (3d Cir. 1988) ("In our view, a showing of discriminatory intent does not require the explicit demonstration by a plaintiff of an employer's 'invidious purpose' or 'hostile motive.'").   Because plaintiffs must show that discrimination was the standard operating procedure, "the liability phase is largely preoccupied with class-wide statistical evidence directed at establishing an overall pattern or practice of intentional discrimination." *Robinson*, 267 F.3d at 168.  "Statistics alone can make out a prima facie case of discrimination if the statistics reveal 'a gross disparity in [the] treatment of workers based on race.'" *Id.* at 158 (quoting *Lopez v. Laborers Int'l Union, Local No. 18*, 987 F.2d 1210, 1214 (5th Cir.1993) (internal quotation marks omitted); *see also Bell v. E.P.A.*, 232 F.3d 546, 553 (7th Cir. 2000) ("In a pattern and practice disparate treatment case, statistical evidence constitutes the core of a plaintiff's prima facie case.").

However, "statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted.  In short, their usefulness depends on all of the surrounding facts and circumstances." *Teamsters*, 431 U.S. at 340.  If the statistical disparity is insufficient to establish a prima facie case alone, "the plaintiff may get over his or her initial hurdle by combining statistics with historical, individual, or circumstantial evidence." *Carroll v. Sears, Roebuck & Co.*, 708 F.2d 183, 190 (5th Cir. 1983).  Ordinarily, therefore, plaintiffs prove their case "through a combination of strong statistical evidence of disparate impact coupled with anecdotal evidence of

24

the employer's intent to treat the protected class unequally." *Mozee v. Am. Comm'l Marine Serv. Co.*, 940 F.2d 1036, 1051 (7th Cir.1991); *see also E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1274 (11th Cir. 2000) (explaining that plaintiffs normally prove that discrimination is a company's standard operating procedure through a combination of statistics and anecdotes); *Carroll*, 708 F.2d at 190 (explaining that statistics may be buttressed with "evidence of a history of discrimination practiced by the employer, individual instances of discrimination, and opportunities to discriminate in the employer's decision-making processes").  Such anecdotal evidence will not normally be sufficient to prove a pattern or practice of discrimination; rather "it simply provides 'texture' to the statistics."  *Robinson*, 267 F.3d at 168; *see also Teamsters*, 431 U.S. at 339 (stating that anecdotal evidence of personal experiences with a company bring "the cold numbers convincingly to life").

> 2.     Disparate Impact

A disparate impact violation under Title VII, on the other hand, "is made out when an employer is shown to have used a specific employment practice, neutral on its face but causing a substantial adverse impact on a protected group, and which cannot be justified as serving a legitimate business goal of the employer."  *Metal Serv. Co.*, 892 F.2d at 346.  Unlike the disparate treatment theory of liability, "[p]roof of discriminatory motive . . . is not required under a disparate-impact theory."  *Teamsters*, 431 U.S. at 335 n.15.

Accordingly, to establish a prima facie case of disparate impact discrimination, "a plaintiff is required to demonstrate that application of a facially neutral standard has resulted in a significantly discriminatory hiring pattern."  *Newark Branch, N.A.A.C.P. v. Town of Harrison, N.J.*, 940 F.2d 792, 798 (3d Cir. 1991).  A plaintiff must make "a threshold showing that some employment practice causes a significant statistical disparity, or has the effect of denying members of one race

equal employment opportunities." *Nat'l Ass'n for the Advancement of Colored People v. N. Hudson Reg'l Fire & Rescue*, 742 F. Supp. 2d 501, 511 (D.N.J. 2010*) aff'd sub nom. N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464 (3d Cir. 2011) (citing *Ricci*, 557 U.S. at 587).

Proof of causation is essential for a prima facie case; a plaintiff must "demonstrate that the disparity they complain of is the result of one or more of the employment practices that they are attacking here, specifically showing that each challenged practice has a significantly disparate impact on employment opportunities for whites and nonwhites." *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 657 (1989); *see also N. Hudson Reg'l Fire*, 665 F.3d at 476–77. "To prove causation through statistical evidence alone, the statistics must be 'of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group. . . . [S]tatistical disparities must be sufficiently substantial that they raise such an inference of causation.'" *Newark Branch, N.A.A.C.P. v. City of Bayonne, N.J.*, 134 F.3d 113, 121 (3d Cir. 1998) (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994–95 (1988)). The relevant comparison in showing statistical disparity is "between the racial composition of those qualified persons in the relevant labor market and that of those in the jobs at issue." *Town of Harrison*, 940 F.2d at 798.

If a plaintiff establishes a prima facie case of disparate impact discrimination, the company may defend against liability by demonstrating that the practice is "job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i). The Third Circuit has "interpreted the business-necessity defense to mean that employers may not use criteria which have a discriminatory effect unless those criteria define the minimum qualifications necessary to perform the job." *N. Hudson Reg'l Fire*, 665 F.3d at 477. An employer "must assert actual reasons why the challenged employment practice is important to the position; the mere

assertion of conceivable bases is not sufficient." *Id.* (quotation and citation omitted).  If the employer successfully makes a business-necessity defense, a plaintiff can still succeed "by showing that alternative practices would have less discriminatory effects while ensuring that candidates are duly qualified." *N. Hudson Reg'l Fire*, 665 F.3d at 477 (citing 42 U.S.C. § 200e-2(k)(1)(A)(ii), (C)).

**III.    Analysis**

FAPS has moved for summary judgment on both claims for discrimination brought by the EEOC.  The crux of FAPS's motion is that the EEOC has failed to establish that it engaged in word-of-mouth recruitment, and accordingly its claims for violations of Title VII must fail.  FAPS has also moved for summary judgment, on the basis that the EEOC failed to satisfy its statutory conciliation obligations prior to filing suit.  The Court addresses these arguments below.

A.    *EEOC's Obligation to Conciliate*

Because FAPS argues that the EEOC has failed to satisfy its conciliation requirements, a mandatory prerequisite to filing suit, the Court addresses this issue first.  In the Court's accompanying Opinion today, the statutory requirement of conciliation and the current Circuit split regarding whether and to what extent a court may enforce EEOC's mandatory duty to conciliate discrimination claims before filing suit is discussed in detail.  As relevant here, the Third Circuit has yet to address this issue.  Courts in this Circuit, however, have implicitly found that the EEOC's conciliation efforts are subject to judicial review, and have scrutinized the conciliation process to see if the EEOC's efforts met a minimum level of good faith. *See, e.g.*, *E.E.O.C. v. Hugin Sweda, Inc.*, 750 F. Supp. 165, 168 (D.N.J. 1990) (staying a matter where there was a lack of good faith conciliation effort on the EEOC's part); *E.E.O.C. v. Rhone-Poulenc, Inc.*, 677 F. Supp. 264, 266 (D.N.J. 1988) *aff'd*, 876 F.2d 16 (3d Cir. 1989) (finding that the EEOC made an adequate attempt to

conciliate after reviewing evidence of the conciliation conference); *E.E.O.C. v. Sears, Roebuck & Co.*, 391 F. Supp. 2d 317, 320 (D.N.J. 2005) (reviewing the conciliation efforts of the EEOC and finding that the EEOC conciliated in good faith, but refusing to review the "form and substance" of the conciliation proposal); *EEOC v. Equicredit Corp. of Am.*, No. 02-CV-844, 2002 WL 31371968, at *3–4 (E.D. Pa. Oct. 8, 2002) (finding that the record indicated that the EEOC "made a sincere and reasonable effort to negotiate in good faith, thereby fulfilling its obligations"); *E.E.O.C. v. LifeCare Mgmt. Servs.*, LLC, 02: 08-CV-1358, 2009 WL 772834, at *5 (W.D. Pa. Mar. 17, 2009) ("The issue of whether the EEOC attempted to conciliate the underlying charge in good faith is a legal matter for the Court to determine, not the jury."); *E.E.O.C. v. Bimbo Bakeries USA, Inc.*, CIV. 1:09-CV-1872, 2010 WL 598641 (M.D. Pa. Feb. 17, 2010) (staying the action for a conciliation conference where the court found that there was no good faith effort to conciliate by the EEOC); *E.E.O.C. v. U.S. Steel Corp.*, CIV.A. 10-1284, 2013 WL 625315, at *7–11 (W.D. Pa. Feb. 20, 2013).

However, the Court need not address what level of scrutiny it would afford to the EEOC's efforts here, because FAPS has inappropriately disclosed conciliation materials in violation of 42 U.S.C. § 2000e-5(b).  Title VII expressly states:

> Nothing said or done during and as a part of such informal endeavors may be made public by the Commission, its officers or employees, or used as evidence in a subsequent proceeding without the written consent of the persons concerned. Any person who makes public information in violation of this subsection shall be fined not more than $1,000 or imprisoned for not more than one year, or both.

42 U.S.C. § 2000e-5(b).  As part of its argument that the EEOC has failed to conciliate in good faith, FAPS has disclosed and used evidence describing in detail the correspondences the parties exchanged during the conciliation process, undeniably without the written consent of the EEOC. Under the plain language of the statute, disclosure of this information is prohibited, with no

exceptions, and the persons concerned have the discretion to consent or not to consent to such disclosure.  *See LifeCare Management*, 2009 WL 772934, at *4.  Here, the EEOC has objected to the disclosure of this confidential information.   FAPS's disclosure of this information is clearly forbidden, and the Court accordingly cannot consider it in making its determination regarding the EEOC's efforts at conciliation.  "[V]irtually every case holding that the EEOC failed to satisfy the Title VII prerequisites brought before this Court's attention has delved into the details of the conciliation process."  *U.S. Steel*, 2013 WL 625315, at *10.  Lacking such details, the Court cannot appropriately determine whether or not the EEOC appropriately fulfilled its conciliation requirements.  Therefore, the Court denies FAPS's motion for summary judgment on these grounds, and proceeds to the merits of the EEOC's Title VII claims.[3]

B.     *Disparate Impact Discrimination Claim*

The EEOC has alleged that FAPS's use of word-of-mouth recruiting, a facially neutral practice, has caused a substantial adverse impact on the number of African Americans FAPS has hired.  FAPS has moved for summary judgment, arguing that the EEOC has failed to establish a prima facie case because it has failed to show that a particular employment practice (here, the use of word-of-mouth recruiting) has created the disparate impact.  *See Wards Cove*, 490 U.S. at 656–57.  The Court agrees.

In support of its prima facie case, the EEOC has supplied statistical evidence that it argues demonstrates that FAPS's word-of-mouth recruiting adversely impacted the number of African Americans hired.  *See* Pl.'s Opp. Br. at 29.  Specifically, the EEOC has submitted the expert report of Dr. LaJeunesse.  As discussed in detail above, Dr. LaJeunesse found that, for the period of 1999

---

[3] To the extent that the EEOC has moved for summary judgment on the grounds that there is no general "failure to conciliate" defense, the Court denies this motion.  Not only is it unnecessary for the Court to make this determination in this case, but, as discussed, courts in this Circuit (and the vast majority of other Circuits) have consistently held that such judicial review exists.

to 2008, FAPS hired few African Americans than would be expected given the available labor market and that there was virtually a zero percent chance that the shortfall of African American hiring at FAPS resulted by chance.  Dr. LaJeunesse also found that "a staggering 76% of 951 applicants that listed a referral source heard about vacant positions at FAPS from a friend," and that less than 5% of FAPS applicants listed "advertisement" as the source of their knowledge about a job.  *See* LaJeunesse Report at 5.  Dr. LaJeunesse also found that "the African American representation rate of the extant FAPS applications is significantly lower than the labor force participation rate of African Americans in the local labor market," leading him to find that "the positions were not sufficiently advertised to the diverse labor force in the vicinity of FAPS."  *Id.* at 4–5.  This led him to conclude that the application database was "suggestive of word-of-mouth advertising."  *Id.* at 5.

While Dr. LaJeunesse did not attempt to determine whether word-of-mouth recruitment was an employment practice employed by FAPS, he did find evidence of "insider knowledge in terms of identifying potential job openings."  LaJeunesse Dep. 102:14–17.   To Dr. LaJeunesse, "insider knowledge" exists when the primary way a potential job applicant would become aware of an opening in a company is through a "relative or family member that works there or [if they] have some link to the labor union," *id.* at 63:22–64:2  Dr. LaJeunesse later clarified that "insider knowledge" is the "very definition of word-of-mouth recruiting. . . ."  Reply Expert Report of Dr. Robert LaJeunesse ("LaJeunesse Rep. Report") at 4–5.  It is undisputed that, under the terms of the CBA, FAPS had an obligation to notify the Union when it was recruiting.  Because Union application were guaranteed an interview, Union members applying to FAPS would indicate on their application that they were referred by the Union.  As referenced above, Dr. LaJeunesse's definition of "insider knowledge" encompassed those applicants who learned of a job opening at

FAPS through a Union connection.  *See* LaJeunesse Dep. 103:4–20.  Accordingly, all individual applications reflecting referrals to FAPS by Union officials were included as "evidence of insider knowledge" by Dr. LaJeunesse.  *Id.* at 108:5–8.  Dr. LaJeunesse, however, could not quantify the effect of this contractual obligation as to the statistical influence on recruitment and hiring by FAPS.

      Consequently, while the EEOC has submitted statistical evidence that shows a disparity in the number of African American hires at FAPS, it has failed to make a prima facie showing of discrimination as a *result* of word-of-mouth recruiting.  The EEOC has simply not shown that word-of-mouth recruiting, "independent of other factors that may affect the racial balance in the workplace, is causally related to the discrimination in the number of blacks hired."  *Carroll*, 708 F.2d at 189.  By failing to quantify the effect of that FAPS's contractual obligation to notify and interview the Union of potential job openings as to the statistical influence on recruiting or hiring at FAPS, the EEOC has failed to "isolat[e] and identify[] the specific employment practices that are allegedly responsible for any observed statistical disparities."  *Wards Cove,* 490 U.S. at 656 (quoting *Watson*, 487 U.S. at 994 (O'Connor, J., concurring)).  "[A] Title VII plaintiff does not make out a case of disparate impact simply by showing that, 'at the bottom line,' there is a racial imbalance in the work force."  *Wards Cove,* 490 U.S. at 657.  "The EEOC here, in essence, is attacking [FAPS's] overall hiring procedure by pointing to the 'bottom line' results; it has not made the more focused allegation required by *Wards Cove* that a specific, affirmative employment practice caused the disparity."  *E.E.O.C. v. Chicago Miniature Lamp Works*, 947 F.2d 292, 305 (7th Cir. 1991).  Because the EEOC has failed to isolate the discriminatory effect of the practice it is challenging, it has failed to "show that the specific factor challenged under the disparate impact model results in the discriminatory impact."  *Carroll*, 708 F.2d at 190.

There is also another reason why the EEOC has failed to establish disparate impact discrimination.  The EEOC has submitted facts showing the limited ways that FAPS would advertise during the relevant time and that FAPS would notify its workforce when it was hiring by posting hiring announcements next to the employee time clocks.  The record also indicates that, while FAPS management was aware that its workers would spread the word about job openings at FAPS, there was no active encouragement and/or company policy with respect to the use of word-of-mouth recruitment.  There is no allegation that FAPS has affirmatively engaged in word-of-mouth recruiting by telling, encouraging, or actively promoting its employees to refer applicants to open jobs.  Rather, the proof establishes that FAPS "passively waited for applicants who typically learned of opportunities from current [FAPS] employees." *Chicago Miniature Lamp Works*, 947 F.2d at 305.  This behavior is not considered to be an employment practice for the purposes of disparate impact liability because "[t]he practices here are undertaken solely by employees." *Id.*

Overall, the undisputed record establishes that the EEOC has failed to establish the essential element of causation in its disparate impact claim.  Specifically, it has failed to prove that word-of-mouth recruiting, "independent of other factors that may affect the racial balance in the workplace," caused the observed racial imbalance at FAPS.  *See Carroll*, 708 F.2d at 189.  Therefore, summary judgment will be entered for FAPS on the EEOC's disparate impact claim.

C.      *Pattern or Practice of Disparate Treatment*

On the other hand, FAPS has failed to show that there is no genuine issue of material fact with regard to the EEOC's claim for pattern or practice of disparate treatment discrimination.  Rather, the parties' briefs and the record in general demonstrate multiple factual disputes that prevent summary judgment from being entered.

The EEOC has supplied both statistical and anecdotal evidence to establish a prima facie case of pattern or practice of disparate treatment.  First, as discussed, the EEOC has supplied the expert report of Dr. LaJeunesse as statistical evidence of hiring discrimination at FAPS.  Once again, Dr. LaJeunesse found that, from 1999 to 2008, FAPS hired fewer African Americans than would be expected, given the available labor market.  These shortfalls were statistically significant every year in which more than 10 employees were hired.  Overall, Dr. LaJeunesse concluded that there was virtually a zero percent chance that the shortfall of African Americans at FAPS resulted by chance.  Such statistical evidence, revealing an apparent "gross disparity in [the] treatment of workers based on race," *Robinson*, 267 F.3d at 158, is the "core" of a prima facie case of discrimination.  *See Bell*, 232 F.3d at 553.

In an attempt to discredit this report, FAPS argues that Dr. LaJeunesse failed to consider certain elements of its hiring and recruiting processes erroneously (specifically, the job skills of its potential employees) or failed to consider them at all (the Union's influence on hiring and the Waterfront Commission process).  FAPS appears to contend that because the EEOC's claim is premised on "nearly exclusive reliance" upon this report, and because this report is "meritless," the EEOC has failed to prove its claim and summary judgment should be entered.  *See* Def.'s Br. at 21–22.  As discussed with FAPS's motion to exclude Dr. LaJeunesse's testimony, the major problem with FAPS's argument is that these issues all relate to the weight to be afforded to the conclusions made by Dr. LaJeunesse.  During summary judgment, the Court may not determine whether or not it agrees with the expert's conclusions.  Rather, such determinations regarding what Dr. LaJeunesse did and did not rely on in making his determinations goes to the weight that the jury should afford his testimony.  *See Breidor*, 722 F.2d at 1139 (explaining that, once an expert's report has been deemed admissible, any issues of the credibility or weight of an expert's testimony "is to be

33

determined by the jury, not the trial judge").  FAPS may appropriately bring out such arguments

exploring the facts and assumptions of Dr. LaJeunesse's testimony during cross-examination.[4]  *See*

*Stecyk*, 295 F.3d at 414.  Accordingly, while FAPS may adamantly disagree with some of Dr.

LaJeunesse's determinations, its arguments are ill-suited for this stage of the proceedings.

The EEOC has buttressed its statistical evidence with anecdotal evidence in order to show

discriminatory animus on the part of FAPS.  For example, FAPS's owner, Gary LoBue, explained

that it failed to provide sponsorship letters to African Americans applying for jobs at FAPS because

a "good part" of the African Americans that are qualified to work at FAPS "have a criminal

background record" and therefore could not get a waterfront card.  *See* Deposition of Gary LoBue

("LoBue Dep.") 119:20-120:10. LoBue credited FAPS's success in recruiting more African

Americans because it has lowered its skill requirements and because they are hiring younger

African Americans whom he says have not gotten a criminal record yet.  *See id.* at 121:12-25.

Considering the facts in the light most favorable to FAPS, such testimony allows for an

inference that FAPS had a discriminatory animus towards African Americans.  FAPS's argument is

premised on the Waterfront Commission "vetting out" applicants with a criminal background.  The

EEOC, however has supplied disputing FAPS's contention that a criminal record is an automatic

disqualifier for an applicant seeking a waterfront card.  For example, Jeffrey Schoen, the Director of

Law and Licensing for the Commission, has testified 75% of applicants who are flagged for having

a criminal record or some other prior bad act are issued a waterfront card.  *See* Deposition of Jeffrey

Schoen ("Schoen Dep.") 101:5-9.  Because the Waterfront Commission reviews each license

request on a case-by-case basis, a criminal conviction is not a per se disqualification from receiving

a waterfront license, and the Waterfront Commission does not require or suggest that employers

---

[4] One of the biggest disputes here relates to Dr. LaJeunesse's finding that FAPS was hiring unskilled or semi-skilled workers during the relevant time period.  FAPS strongly disputes this finding.  The Court, however, cannot appropriately resolve this factual debate.

pre-screen job applicants for a criminal record.  *See* Deposition of William Mazur ("Mazur Dep.")

137:10-16, 143:10-17; Schoen Dep. 81:20-82:1; Deposition of Julie Lynch ("Lynch Dep.") 289:16-

20.  While the Court agrees with FAPS that there is nothing inherently discriminatory about

refusing to employ someone with a criminal background, the EEOC has certainly raised facts that

support an inference that FAPS was refusing to sponsor African Americans based upon a

discriminatory presumption that an African American applicant must have a criminal record.

   Furthermore, the EEOC has supplied individual testimony from African American claimants

in this case who attempted to apply to FAPS. Such testimony helps bring "the cold numbers

convincingly to life . . . ." *Teamsters*, 431 U.S. at 339.  While Human Resources Director Lynch

testified that she reviewed all job applications and spoke with each applicant to determine their

relevant skills and experience,[5] the claimants reported that Lynch did not review the information on

their job applications, did not ask questions about their background or experience, and did not

provide a sponsorship letter or advise them that they needed to obtain a Waterfront card from the

Commission.  For example, one of these claimants testified that he was told that FAPS was not

hiring when he asked if he could fill out an application—allegedly at the same time a white

Hispanic applicant was sitting in the reception area filling out an application. Such anecdotal

evidence certainly provides texture to EEOC's claim of discriminatory bias on behalf of FAPS

while determining whether to issue sponsorship letters to African American applicants.

---

[5] FAPS has also argued in its moving brief that the EEOC has failed to prove that FAPS knew the potential claimants belonged to a protected group, part of its prima facie case. FAPS argues that the EEOC has failed to produce any evidence that it knew the applicants identified as African Americans because FAPS's application does not include any questions about or otherwise indicate the applicant's race or gender.  However, the determination of whether FAPS knew that the potential claimants belonged to the protected group is based on FAPS' perception of the applicants' race. *See Perkins v. Lake County Dep't of Utilities*, 860 F. Supp. 1262, 1277 (N.D. Ohio 1994); *Eriksen v. Allied Waste Sys., Inc.*, 06-13549, 2007 WL 1003851, at *5 (E.D. Mich. Apr. 2, 2007) (quoting *Bennun v. Rutgers State Univ.*, 941 F.2d 154, 173 (3d Cir. 1991)).  Accordingly, because the record has established that FAPS directly observed the race of the applicants when they handed in their job applications and when Lynch interviewed them, such an argument is meritless.

FAPS also argues that there is no evidence that it used word-of-mouth recruiting, which it describes as the "heart of the EEOC's case." Def.'s Reply Br. at 15. In support of this claim, FAPS points to testimony by three company officials, all of which testified that word-of-mouth recruitment is not actively encouraged or promoted at FAPS. The EEOC, however, has supplied evidence that supports an argument that FAPS does rely on word-of-mouth recruiting. For example, one of the first steps that FAPS took when hiring was to notify its existing workforce by posting a job opening announcement next to the employee time clock. LoBue was aware that its employees would tell their friends and family that FAPS was hiring. FAPS had a lot of walk-in applicants. FAPS also did very little to publicize job openings beyond the Port; in general, FAPS rarely placed job advertisements in newspapers for unskilled or semi-skilled jobs.[6] Approximately 60% of FAPS's employees are Spanish/Portuguese speaking, and FAPS did place advertisements in two Spanish language newspapers seeking security guards and auto mechanics from 2000–2007. Additionally, the FAPS job application, which was drafted by LoBue and Lynch, twice asks an applicant who referred him to FAPS. The responses on these applications reveal that most applicants heard about the job by word-of-mouth, and that there was little advertising to track. Dr. LaJeunesse, in his report, found that 76% of 951 applications that listed a referral source heard about a vacant position at FAPS from a friend, while less than 5% of FAPS applicants listed "advertisement" as the source of their knowledge about the job. Combined with the lack of advertising and the low composition of African American applicants, Dr. LaJeunesse was led to the conclusion that FAPS practices were "suggestive of word-of-mouth advertising." *See* LaJeunesse Report at 4–5. Considering these facts in the light most favorable to the EEOC, as the non-moving

---

[6] Once again, according to FAPS, it had no need for and did not hire any "unskilled" workers during the relevant time period. The EEOC, on the other hand, asserts that FAPS was hiring such workers.

party, the EEOC has supplied enough evidence that FAPS could have used word-of-mouth recruiting.

      While the EEOC has failed to supply evidence to prove that word-of-mouth recruiting was the cause of a disparate impact on African American hiring, there is evidence that suggests that FAPS relied, at least in part, on word-of-mouth recruiting for hiring.  When combined with the small number of African American applicants and hires during the relevant time period, evidence of this method of recruiting must be considered "circumstantial evidence which help to establish a reasonable inference of an employer's discriminatory treatment of blacks as a class."  *Metal Serv. Co.*, 892 F.2d at 350.  As the Third Circuit has explained, when an employer that relies primarily upon its existing workplace to refer potential employees, it is not surprising that historic racial imbalances in the workplace are perpetuated because "existing white employees tend[ ] to recommend their own relatives, friends and neighbors, who would likely be the same race." *Metal Serv. Co.*, 892 F.2d at 350 (quoting *Parham v. Sw. Bell Tel. Co.*, 433 F.2d 421, 426 (8th Cir. 1970)).  While the Court agrees with FAPS that the general use of word-of-mouth recruiting is not, in itself, a per se violation of the law, *see, e.g.*, *E.E.O.C. v. Consol. Serv. Sys.*, 989 F.2d 233, 236 (7th Cir. 1993), the Court is constrained at this time to view the evidence supporting the possibility of word-of-mouth recruiting as circumstantial evidence of FAPS's discriminatory treatment of African Americans.

      Overall, the Court finds that the EEOC has produced enough evidence at this stage of the proceedings to establish that "discrimination was the employer's standard practice."  *Dillon*, 746 F.2d at 1004.  The EEOC has provided evidence to prove FAPS's discriminatory intent, a critical element for a pattern or practice disparate treatment claim.  First, and most significantly, the EEOC has supplied statistical evidence which reveals a clear disparity in the recruiting and hiring of

African Americans by FAPS, which is directed at proving that FAPS "routinely and purposely" discriminated against African Americans.   *King*, 960 F.2d at 624; *see also Teamsters*, 431 U.S. at 335.  Next, the EEOC has provided evidence meant to prove that FAPS relied on word-of-mouth recruiting, and that such recruitment resulted in a relatively small number of minority applicants. At this stage of the proceedings, such evidence must be considered "circumstantial evidence which helps establish a reasonable inference of an employer's discriminatory treatment of blacks as a class."  *Metal Services*, 892 F.3d at 350.  The EEOC has bolstered this evidence with anecdotal evidence, all of which is directed at proving that FAPS "routinely and purposely" discriminated against African Americans.   *King*, 960 F.2d at 624; *see also Teamsters*, 431 U.S. at 335.

While FAPS has presented several business justifications for any disparate treatment of African Americans, the EEOC has provided facts that create a factual issue pertaining to whether these purported reasons for the alleged pattern or practice of disparate treatment are in fact a pretext. *See Teamsters*, 431 U.S. at 361 n.50.  Generally, FAPS argues that the realities of its business combined with the barriers presented by the Waterfront Commission and the Union are what led to the lack of African Americans recruited or hired by FAPS, rather than any discriminatory intent. For example, FAPS argues that it is constrained in its ability to hire African Americans because the Waterfront Commission will not approve an applicant who has a criminal background.  As discussed above, the EEOC has supplied evidence that suggests that the Waterfront Commission does not automatically deny an application of someone with a criminal background.  Further, FAPS appears to assume that African American applicants are likely to have a criminal background, indicative of a discriminatory intent.  FAPS has also argued that the Union is responsible for the recruiting and hiring decisions at FAPS.  While this may be true, there is evidence that indicates that the Union did not impose restrictions on how FAPS recruited.  Likewise, Union officials testified

38

that FAPS was under no obligation to hire members.  Finally, FAPS argues that it was only hiring

skilled workers, who had specialized training, during the relevant time.  As discussed throughout

this Opinion, whether FAPS was hiring skilled or unskilled workers during this period is strongly

debated by the parties.  Accordingly, while FAPS's arguments pertaining to non-discriminatory

justifications for a lack of African American hires may prove meritorious, the EEOC has provided

sufficient evidence that would allow a reasonable juror to find these reasons to be merely pretextual.

The Court stresses that this does not mean that the EEOC will win this case; the Court's

ruling here is simply based upon the numerous factual disputes that preclude summary judgment.

From the dispute over whether FAPS was hiring during the relevant time period, to what skill-level

of workers it was hiring, to the actual impact the Union and the Waterfront Commission had on its

hiring process, to the weight to be given to Dr. LaJeunesse's testimony, and to whether FAPS

engaged in actual intentional discrimination against the African American community,[7] FAPS's

motion asks the Court to draw too many factual conclusions.  Accordingly, summary judgment on

the EEOC's pattern or practice of disparate treatment claim must be denied.

D.    *Time-Barred Claims*

Finally, the Court moves to FAPS's other motion for summary judgment.  This motion

---

[7] As the Seventh Circuit has explained:

Discrimination is not preference or aversion; it is acting on the preference or aversion. If the most efficient method of hiring, adopted because it is the most efficient (not defended because it is efficient-the statute does not allow an employer to justify intentional discrimination by reference to efficiency, 42 U.S.C. § 2000e-2(k)(2), just happens to produce a work force whose racial or religious or ethnic or national-origin or gender composition pleases the employer, this is not intentional discrimination. The motive is not a discriminatory one. Knowledge of a disparity is not the same thing as an intent to cause or maintain it. Or if, though the motives behind adoption of the method were a mixture of discrimination and efficiency, [the company] would have adopted the identical method of recruitment even if [it] had no interest in the national origin of his employees, the fact that [it] had such an interest would not be a "but for" cause of the discriminatory outcome and again there would be no liability.

*E.E.O.C. v. Consol. Serv. Sys.*, 989 F.2d 233, 236 (7th Cir. 1993).  In other words, the EEOC must establish that FAPS "is biased in favor of [the favored group] or prejudiced against any group underrepresented in [its] work force."  *Id.*

requires the Court to determine whether the "charge-filing" period set forth in Section 706(e)(1) of Title VII, 42 U.S.C. § 2000e–5(e)(1), applies to bar claims that accrued prior to the filing of the Commission's Charge in this case. Specifically, the Court must determine if the EEOC may seek relief for individuals who were denied employment more than 300 days before the filing of the Commissioner's Charge on October 18, 2007.

It is undisputed here that the EEOC filed a Commissioner's Charge against FAPS on October 18, 2007, alleging that FAPS engaged in an on-going pattern or practice of race and sex discrimination against African Americans and female applicant and employees from at least 2004 through 2007. The Charge was brought by the EEOC and stated that "[t]he persons aggrieved include all persons who have been, continue to be, and will in the future be adversely affected by the unlawful practices complained of herein." *See* FAPS's Statement of Undisputed Facts ("FAPS Facts") ¶¶ 209–12. Based upon the EEOC's subsequent investigation of these charges, the EEOC filed this lawsuit on June 17, 2010. The Complaint asserts that, from at least 2004 until the present, FAPS engaged in an ongoing pattern or practice of race discrimination against African Americans in recruiting and hiring in violation of Title VII. Compl. ¶¶ 7–10. In its Complaint, the EEOC seeks "to provide appropriate relief to a class of potential and actual class applicants who were adversely affected" by FAPS's alleged wrongful actions. Compl. at 1.

Under section 706 of Title VII, the EEOC may file a charge against a private employer on behalf of a "person or persons aggrieved" by an unlawful employment practice. 42 U.S.C. § 2000e-5(f)(1). Under section 707 of Title VII, the EEOC may file a charge against an employer that the EEOC has reason to think engaged in a "pattern or practice" of discrimination. *Id.* § 2000e-6. As is obvious from the instant action, the EEOC is empowered to sue if conciliation or other forms of voluntary compliance is unsuccessful. *See id.* § 2000e-5(f)(1).

Under section 706, the EEOC's enforcement authority is subject to several procedural requirements.  Section 707 requires the EEOC to "investigate and act on a charge of a pattern or practice of discrimination . . . in accordance with the procedures set forth in [section 706]."  *Id.* § 2000e-6(e).  Of particular relevance here, Section 706 sets forth a "charge-filing" requirement, providing:

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice . . . such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred . . . .

*Id.* § 2000e-5(e)(1).  In other words, an individual seeking to challenge an employment practice must first file a charge with the EEOC within 180 or 300 days (in New Jersey, 300 days) after the alleged unlawful practice occurred.  "A claim is time barred if it is not filed within these time limits."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).

The question here, then, is whether Section 707 incorporates the charge-filing period of section 706.  FAPS argues that Section 706(e)(1) limits the class of individuals for whom the EEOC can seek relief to those individuals who were allegedly subjected to unlawful employment practices during the 300 days before the date of the Commissioner's Charge.  The EEOC argues that it is not bound by the 300-day charge-filing period set forth in Section 706 when it brings suit pursuant to its authority under Section 707 based upon its "explicit statutory imperative to correct unlawful employment policies and practices . . . ."  Pl.'s Opp. Br. at 30.

There has yet to be a court of appeals to address the issue of whether the EEOC may permissibly seek relief under Section 707 for individuals who were allegedly subjected to a discriminatory act more than 300 days prior to the filing of an administrative charge and district

courts that have addressed the issue are split.  Some courts, including one in this District, have held

that the plain language of the statute mandates that Section 706's "charge-filing" requirement

applies.  *See, e.g.*, *E.E.O.C. v. Princeton Healthcare Sys.*, CIV.A. 10-4126, 2012 WL 5185030, at

*3–4 (D.N.J. Oct. 18, 2012); *EEOC v. Presrite Corp.*, No. 11 CV 260, 2012 WL 3780351, at *2

(N.D. Ohio Aug. 30, 2012); *EEOC v. Global Horizons, Inc.*, No. CV11–3045–EFS, 2012 WL

3095577, at *6–7 (E.D. Wash. July 27, 2012); *U.S. Steel*, 2012 WL 3017869, at *5–5; *EEOC v.

PBM Graphics Inc.*, 877 F. Supp. 2d 334, 351–53 (M.D.N.C. 2012); *EEOC v. Bass Pro Outdoor

World, LLC*, 884 F.Supp.2d 499, 522–23 (S.D. Tex. 2012); *E.E.O.C. v. Kaplan Higher Educ. Corp.*,

790 F. Supp. 2d 619, 622-23 (N.D. Ohio 2011); *E.E.O.C. v. Bloomberg L.P.*, 751 F. Supp. 2d 628,

645–47 (S.D.N.Y. 2010); *EEOC v. Freeman*, No. RWT 09cv2573, 2010 WL 1728847, at *3–5 (D.

Md. Apr.27, 2010); *EEOC v. Burlington Med. Supplies, Inc.*, 536 F. Supp. 2d 647, 658–59 (E.D.

Va. 2008); *EEOC v. Custom Co., Inc.*, No. 02 C 3768, 2004 WL 765891, at *2–11 (N.D. Ill. Apr. 7,

2004); *EEOC v. Optical Cable Corp.*, 169 F. Supp. 2d 539 545–47 (W.D.Va.2001); *EEOC v. Sears,

Roebuck & Co.*, 490 F. Supp. 1245, 1259–61 (M.D. Ala. 1980).

Other courts have found that the 300-day limitations period is inapplicable to the EEOC.

*See, e.g.*, *EEOC v. Sterling Jewelers, Inc.*, No. 08–CV–706, 2010 WL 86376, at *3–5 (W.D.N.Y.

Jan.6, 2010); *EEOC v. LA Weight Loss*, 509 F. Supp. 2d 527, 535 (D. Md. 2007); *EEOC v. Scolari

Warehouse Mkts., Inc.*, 488 F. Supp. 2d 1117, 1136 (D. Nev. 2007); *EEOC v. Dial Corp.*, 156 F.

Supp. 2d 926, 966–67 (N.D. Ill. 2001); *EEOC v. Mitsubishi Motor Mfg. of Am.*, 990 F. Supp. 1059,

1085–93 (C.D. Ill. 1998); *E.E.O.C. v. Rymer Foods, Inc.*, 88 C 10680, 1989 WL 88243, at *2 (N.D.

Ill. July 31, 1989); *EEOC v. Cont'l Oil Co.*, 393 F. Supp. 167, 169–70 (D. Colo. 1975).

Like the majority of the courts that have reviewed this issue, the Court is convinced that

Section 706 applies to claims brought by the EEOC.  The plain language of Section 706(e)(1)

clearly precludes the EEOC from seeking relief for individuals who could not have filed an EEOC charge during the filing period.  *See* 42 U.S.C. § 2000e–5(e)(1) ("[A] charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred . . . .").  This language is expressly incorporated into Section 707 via subsection (e), precluding the EEOC from seeking relief for individuals who were not subjected to an unlawful employment practice during the 300 days before the filing of the triggering charge.  *See, e.g.*, *Princeton Healthcare*, 2012 WL 5185030, at *2–4; *U.S. Steel*, 2012 WL 3017869, at *4–6; *Freeman*, 2010 WL 1728847, at *4.  While the EEOC argues that this case is distinguished from *Princeton Healthcare* because it relates to an EEOC's Commissioner's charge alleging a pattern or practice of unlawful discrimination, the Court sees no reason to make such a distinction.  "Nothing in the text of Section 706 or 707 suggests that the EEOC can recover for individuals whose claims are otherwise time-barred. If Congress intended to make an exception for the EEOC to revive stale claims under Sections 706 and 707, it should have said so."  *U.S. Steel*, 2012 WL 3017869, at *5 (quoting *Freeman*, 2010 WL 1728847, at *4).

The EEOC also argues that limiting the EEOC's pattern or practice claims to the procedural requirements of Section 706 impairs its broad authority and responsibility of rooting out "systematic discrimination."  *See* Pl.'s Opp. Br. at 31 (quoting *LA Weight Loss*, 509 F. Supp. 2d at 535).  The Court points out, however, that the EEOC is only "barred…from seeking relief based on stale claims; it remains free to pursue injunctive remedies, as well as equitable and monetary relief for individuals who did or could have filed charges within 300 days of the filing of the triggering charge."  *Freeman*, 2010 WL 1728847, at *5.  Furthermore, just as nothing in the statute indicates that an EEOC commissioner is exempt from the procedural requirements of Section 706, "nothing in the statute indicates that Congress intended to allow the EEOC to revive otherwise stale

individual damage claims."[8] *Bloomberg*, 751 F. Supp. 2d at 645.  Like any limitations period, the

timely charge requirement incorporates other policy and fairness considerations; specifically "[t]his

procedure services an important purpose:  it provides repose for employers and prevents them from

having to defend against long-stale claims."  *Id.* (citing *Occidental Life Ins. Co. v. EEOC*, 432 U.S.

355, 371–72 (1977)); *see also Freeman*, 2010 WL 1728847, at *5 (finding that "concerns of open-

ended liability and the need for prompt notification of the asserted violations to the employer" also

weight in favor of applying the timely charge requirement to claims brought under Section 707  by

the EEOC).  While the EEOC clearly has an important mission, it still "must play on the same field

subject to the same rules as individuals."  *Freeman*, 2010 WL 1728847, at *5.

        The EEOC attempts to evade the charge-filing requirement by arguing that the "continuing

violation" doctrine applies here.   The Court disagrees.   "'When a defendant's conduct is part of a

continuing practice, an action is timely so long as the last act evidencing the continuing practice

falls within the limitations period; in such an instance, the court will grant relief for the earlier

related acts that would otherwise be time barred.'"  *Princeton Healthcare*, 2012 WL 5185030, at *4

(quoting *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1295

(3d Cir. 1991)).  The continuing violations exceptions, however, does not apply to discrete

discriminatory acts, "even when they are related to acts alleged in timely filed charges."  *Morgan*,

536 U.S. at 113; *see also id.* at 112 ("This Court has also held that discrete acts that fall within the

statutory time period do not make timely acts that fall outside the time period.").[9]  Rather, every

discriminatory discrete act "constitutes a separate actionable unlawful employment practice," *id.* at

---

[8] The statute, however, does not bar the EEOC "from using the prior acts as background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113.

[9] "Morgan was not a pattern or practice claim and declined to consider the timely filing question of pattern or practice claims brought by private litigants. The definitions it sets forth for discrete claims and its discussion of the continuing violations doctrine, however, are valuable." *Princeton*, 2012 WL 5185030, at *4 n.1 (quoting *U.S. Steel*, 2012 WL 3017869, at *6 n.11 (quoting *Kaplan*, 790 F. Supp. 2d 619, 624 n.5)).

114, and "therefore starts a new clock for filing charges alleging that act." *Id.* at 113.  In other words, "[t]he charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred."  *Id.* at 113.  Examples of discrete acts include "termination, failure to promote, denial of transfer, or refusal to hire."  *Id.* at 114.

Here, the Court agrees with the reasoning of the *Freeman* Court, which found that the continuing violation doctrine should not generally be permitted to expand the class of individuals for whom the EEOC may seek relief.  As that Court explained:

> [T]he continuing violation permits the inclusion of additional, but otherwise time-barred, *claims*—not the inclusion of otherwise time-barred *parties*. This equitable exception to the 300-day filing period allows an individual who filed a timely charge to recover for acts outside the filing period if the nature of the claim involves repeated conduct constituting a single unlawful employment practice.  It does not, however, excuse a complainant from adhering to the statutory time limits for filing a charge.

*Freeman*, 2010 WL 1728847, at *5 (emphasis in original).  The Court agrees.  Here, the EEOC is seeking to provide relief for individuals who did not experience any discriminatory acts during the filing period.  To use the continuing violation doctrine in such a way expands the doctrine beyond its traditional boundaries, where the doctrine equitably allows claims "composed of a series of separate *acts* that collective constitute one 'unlawful employment practice.'"  *Morgan*, 536 U.S. at 117 (emphasis added).  In these cases, "[i]t does not matter that some component acts of the claim fall outside the statutory time period" because the claim is "based on the cumulative effect of individual acts."  *Id.*  Accordingly, the Court is of the opinion that the continuing violation doctrine should not be expanded to cover such individuals.  *See Freeman*, 2010 WL 1728847, at *6.

On the other hand, employment practices that involve "discrete acts" are different from the sort of amorphous conduct that makes up a claim like a hostile work environment case.  Such practices occur on an identifiable date, and a charge may only be filed to cover such discrete acts

"that 'occurred' within the appropriate time period." *Morgan*, 536 U.S. at 114; *see also O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006) ("[C]auses of action that can be brought individually expire with the applicable limitations period."). This case involves discrete acts; it is not the sort of case where the violation is "composed of a series of separate acts that collective constitute one unlawful employment practice." *Id.* at 117. A pattern or practice of allegedly failing to hire African American applicants does not constitute a continuing violation because the refusal to hire an applicant is a discrete act of discrimination. *See Morgan*, 536 U.S. at 114. "Linking together a series of decisions not to hire under the label of a pattern or practice does not change the fact that each decision constituting the pattern or practice is discrete." *Freeman*, 2010 WL 1728847, at *6; *see also Princeton Healthcare*, 2012 WL 5185030, at *4 (refusing to apply the continuing violation doctrine to a Section 707 claim of pattern or practice discrimination because "the discrete decisions to terminate employment cannot be linked together to create a continuing violation, as a termination occurs on an identifiable date"); *Bloomberg*, 751 F. Supp. 2d at 647 ("The fact that this section 707 action alleges a sort of serial violation involving discrete acts does not convert related discrete acts into a single unlawful practice for purposes of timely filing.") (quotation omitted). Therefore, the Court rules that the continuing violation does not apply to discrete acts of unlawfully failing to hire a particular applicant if the decision not to hire is made outside the limitations period. Accordingly, applicants for employment who FAPS did not hire before December 22, 2006 are not members of the class for whom the EEOC may seek relief. The Court will dismiss any such claims as they relate to hiring decisions made before this date.

## V.    Conclusion

For the foregoing reasons, FAPS's motion for summary judgment is granted in part and denied in part. Specifically, judgment will be entered in favor of FAPS as to the EEOC's Title VII

disparate impact claim, and all claims relating to hiring decisions prior to December 22, 2006 are dismissed.  FAPS's motion to exclude the testimony of the EEOC's expert witnesses is denied.  The EEOC's motion to exclude the testimony of FAPS's expert witness is granted.  An appropriate order accompanies this Opinion.

/s/ Joel A. Pisano
JOEL A. PISANO, U.S.D.J.

Dated: September 26, 2014